# UNITED STATES DISTRICT COURT

# IN THE WESTERN DISTRICT OF MICHIGAN

Benjamin Stanley,

        Plaintiff,

v.

The City of Kalamazoo;
City of Kalamazoo Department of Public Safety;
Integrated Services of Kalamazoo;
Bronson Methodist Hospital;
The City of Kalamazoo Department of Public Safety Records Bureau;
Kalamazoo City Clerk's Office;
City of Kalamazoo Human Resources Department;
Kalamazoo City Attorney's Office;
Kalamazoo City Commissioners, in their individual and official capacities;
Kalamazoo Public Schools;
Kalamazoo Public Schools Board of Education;
Kalamazoo Public Library;
Kalamazoo City Assessor's Office;
Kalamazoo Board of Review for Assessor's;
David Anderson, individually and in his official capacity;
Don Cooney, individually and in his official capacity;
Clyde J. Robinson, individually and in his official capacity;
James K. Ritsema, individually and in his official capacity;
Valerie Storey, individual and in her official capacity;
Bronson Physician John Doe, individual and in his official capacity;
Bronson Security Guard John Doe 1, individual and in his official capacity;
Bronson Security Guard John Doe 2, individual and in his official capacity;
Unknown Bronson Hospital Staff, individual and in their official capacity;
Vernon Coakley, individually and in his official capacity;
John Khillah, individually and in his official capacity;
KDPS Officer John Doe 3, individually and in his official capacity;
KDPS Officer John Doe 4, individually and in his official capacity;
Joshua Pena, individually and in his official capacity;
David Juday, individually and in his official capacity;
John Van Oosterum, individually and in his official capacity;
Charles Perkins, individually and in his official capacity;
Esteven Juarez, individually and in his official capacity;
Jason Adams, individually and in his official capacity;
Debra Miller, individually and in her official capacity;
Patrick McVerry, individually and in his official capacity;
Sean Fletcher, individually and in his official capacity;

Case No.

Hon.

1

Frank Doe, individually and in his official capacity;
Matt Huber, individually and in his official capacity;
Aaron Leal, individually and in his official capacity;
Charles Bear, individually and in his official capacity;
James Chamberlain, individually and in his official capacity;
Patsy Moore, individually and in her official capacity;
Marshall Grate, in his individual and official capacity;
KPS Security Officer, in his individual and official capacity;
Terry New; in his individual and official capacity;
Ryan Wieber; in his individual and official capacity;
Shelly Dusek, in her individual and official capacity;
Norman Artearl, in his individual and official capacity;
Ashton Doe, in his individual and official capacity;
Aaron C. Powers, in his individual and official capacity;


   Defendants.

_____

Eric D. Delaporte (P69673)
DELAPORTE LYNCH, PLLC
Attorney for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
_____



**COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff Benjamin Stanley (hereinafter "Stanley" or "Plaintiff"), by and through his attorney Eric Delaporte of Delaporte Lynch, PLLC, and files his Complaint under 42 U.S.C. §§ 1983 and 1985 for violations of the First Amendment, Fourteenth Amendment, a conspiracy to deprive Plaintiff of his civil rights, and both a violation of, and retaliation in violation of, the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA").   Plaintiff seeks statutory, nominal, compensatory, and punitive damages, including infliction of emotional distress and those damages available under Michigan common law, attorney's fees and costs, and injunctive relief.

<u>GENERAL ALLEGATIONS</u>

<u>JURISDICTION AND VENUE</u>

1. This Complaint is brought under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendment; 42 U.S.C. § 1985 for a conspiracy to deny Plaintiff's civil rights; MCL 37.1602 for violations of, retaliation, and intimidation under the PWDCRA; and other claims that occurred within the boundaries of this Honorable Court's jurisdiction and in which Defendants, a public service/public entity, reside. Thus, venue and jurisdiction are proper in this Honorable Court pursuant to 28 U.S.C. §§ 1331, 1343, 1367, MCL 600.1621, and Michigan common law.

2. Defendant the City of Kalamazoo (hereinafter "the City" or "Kalamazoo"), is a municipal corporation and public body headquartered in Kalamazoo, Michigan.

3. Defendant, the Kalamazoo Department of Public Safety (hereinafter "KDPS") is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

3

4.   Defendant, the City of Kalamazoo Public Safety Records Bureau (hereinafter "KDPS Records Bureau"), is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

5.   Defendant Integrated Services of Kalamazoo (hereinafter "ISK"), is a Community Mental Health Service Provider that delivers services and resources related to mental illness, intellectual and developmental disabilities, and substance use disorders to the Kalamazoo community.   ISK is headquartered in Kalamazoo, Michigan and is situated in this Honorable Court's venue and subject to its jurisdiction for the Counts cited herein.

6.   Defendant Bronson Methodist Hospital (hereinafter "Bronson"), is headquartered in Kalamazoo, Michigan and is situated in this Honorable Court's venue and subject to its jurisdiction for the Counts cited herein.

7.   Defendant, Kalamazoo City Clerk's Office (hereinafter "City Clerk"), is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

8.   Defendant, City of Kalamazoo Human Resources Department (hereinafter "City HR Department"), is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

9.   Defendant, Kalamazoo Public Schools (hereinafter "KPS"), is a Public School District in Kalamazoo, Michigan.

10. Defendant, Kalamazoo City Attorney's Office (hereinafter "City Attorney's Office"), is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

11. Defendant, Kalamazoo City Assessor's Office (hereinafter "City Assessor's Office"), is a Department and/or Office of the City of Kalamazoo, headquartered in Kalamazoo, Michigan.

12. Defendant David Anderson is an individual who resides near or within Kalamazoo, Michigan, and is the Mayor of Kalamazoo and is a Director at Integrated Services of Kalamazoo (ISK).

13. Defendant Don Cooney is an individual who resides near or within Kalamazoo, Michigan, and was the Vice Mayor of Kalamazoo.

14. Defendant Clyde J. Robinson is an individual who resides near or within Kalamazoo, Michigan, and is the former City Attorney for the City of Kalamazoo.

15. Defendant James K. Ritsema is an individual who resides near or within Kalamazoo, Michigan, and is the Kalamazoo City Manager.

16. Defendant Valerie Storey, is a mental health clinician who worked or works for Integrated Services of Kalamazoo in September 2021.

17. Defendant Bronson Physician John Doe is an individual who resides near or within Kalamazoo, Michigan, and was employed by Bronson Methodist Hospital at the time of the incidents forming the basis of this Complaint.

18. Defendant Security Guard John Doe 1 is an individual who resides near or within Kalamazoo, Michigan, and was employed by Bronson Methodist Hospital at the time of the incidents forming the basis of this Complaint.

19. Defendant Security Guard John Doe 2 is an individual who resides near or within Kalamazoo, Michigan, and was employed by Bronson Methodist Hospital at the time of the incidents forming the basis of this Complaint.

20. Unknown Hospital Staff are individuals who reside near or within Kalamazoo, Michigan, and were employed by Bronson Methodist Hospital at the time of the incidents forming the basis of this Complaint.

21. Defendant Former KDPS Chief Vernon Coakley is an individual who resides near or within Kalamazoo, Michigan, and was the Kalamazoo Department of Public Safety Chief at all times relevant to this Complaint.

22. Defendant Officer Joshua Pena is an individual who resides near or within Kalamazoo, Michigan, and works as Police Officer in the Kalamazoo Department of Public Safety Officer.

23. Defendant John Khillah is an individual who resides near or within Kalamazoo, Michigan, and was employed by KDPS at the time of the incidents forming the basis of this Complaint.

24. Defendant KDPS Officer John Doe 3 is an individual who resides near or within Kalamazoo, Michigan, and was employed by KDPS at the time of the incidents forming the basis of this Complaint.

25. Defendant KDPS Officer John Doe 4 is an individual who resides near or within Kalamazoo, Michigan, and was employed by KDPS at the time of the incidents forming the basis of this Complaint.

26. Defendant Officer David Juday is an individual who resides near or within Kalamazoo, Michigan, and works as Police Officer in the Kalamazoo Department of Public Safety.

27. Defendant Officer John Van Oosterum is an individual who resides near or within Kalamazoo, Michigan, and works as Police Officer in the Kalamazoo Department of Public Safety.

28. Defendant Security Officer Charles Perkins is an individual who resides near or within Kalamazoo, Michigan, and was a Kalamazoo City employee at all times relevant to this Complaint.

29. Defendant Esteven Juarez is an individual who resides near or within Kalamazoo, Michigan, and was a Kalamazoo City Commissioner.

30. Defendant Jason Adams is an individual who resides near or within Kalamazoo, Michigan, and is an employee for the City of Kalamazoo.

31. Defendant Debra Miller is an individual who resides near or within Kalamazoo, Michigan, and is an employee for the City of Kalamazoo.

32. Defendant Patrick McVerry is an individual who resides near or within Kalamazoo, Michigan, and is an employee for the City of Kalamazoo.

33. Defendant Sean Fletcher is an individual who resided near or within Kalamazoo, Michigan and currently lives in Metro Detroit, and is the former Director of the Kalamazoo Parks & Recreation Department.

34. Defendant Frank Doe is an individual who resides near or within Kalamazoo, Michigan, and works for the City of Kalamazoo as a security guard.

35. Defendant Matt Huber is an individual who resides near or within Kalamazoo, Michigan, and the Deputy Chief for the Kalamazoo Department of Public Safety.

36. Defendant Aaron Leal is an individual who resides near or within Kalamazoo, Michigan, and is the current City Attorney for the City of Kalamazoo.

37. Defendant Charles Bear is an individual who resides near or within Kalamazoo, Michigan, and is an Assistant City Attorney for the City of Kalamazoo.

38. Defendant James Chamberlain is an individual who resides near or within Kalamazoo, Michigan, and is the Deputy City Manager for the City of Kalamazoo.

39. Defendant Patsy Moore is an individual who resides near or within Kalamazoo, Michigan, and is the previous Deputy City Manager for Kalamazoo.

40. Defendant Marshall Grate is an individual who resides near or within Kalamazoo, Michigan, and is the Corporate Counsel for Defendant Kalamazoo Public Schools.

41. Defendant KPS Security Guard, upon information and belief, is an individual who resides near or within Kalamazoo, Michigan, and is an employee and/or independent contractor of Kalamazoo Public Schools.

42. Defendant Terry New is an individual who resides near or within Kalamazoo, Michigan, and is the Interim Library Director at the Kalamazoo Public Library.

43. Defendant Ryan Wieber is an individual who resides near or within Kalamazoo, Michigan, and was the previous Library Director at the Kalamazoo Public Library.

44. Defendant Shelly Dusek is an individual who resides near or within Kalamazoo, Michigan, and works for the Human Resources Department for the City of Kalamazoo.

45. Defendant Artearl Norman is an individual who resides near or within Kalamazoo, Michigan, and works for the Human Resources Department for the City of Kalamazoo.

46. Ashton Anthony is an individual who resides near or within Kalamazoo, Michigan, and is the Deputy Direct of Parks and Recreation for the City of Kalamazoo.

47. Defendant Aaron C. Powers is an individual who resides near or within Kalamazoo, Michigan, and is the Kalamazoo City Assessor.

<u>COMMON FACTS</u>

48. Plaintiff incorporates the previous paragraphs as if contained herein.

8

49. Plaintiff is a Kalamazoo resident who uses a service dog.  He is also well known and active in his community, including for his involvement in local politics and advocacy, for his role on the City Parks & Recreation Advisory Board (PRAB), and for being involved in Kalamazoo community improvement projects.

50. Plaintiff takes civic engagement seriously and pushes for policies that benefit all people, including those with disabilities, especially those who use service dogs.  As such, he is deeply knowledgeable of his causes and confidently invokes his rights related to service dogs under Michigan Law and the ADA.  Plaintiff's passion makes him excited to share with others the nuances of the law and advocate for those with service dogs and those with disabilities.

51. Plaintiff is also a firm believer in government transparency, and the Open Meetings Act. He does not shy away from demanding that the City of Kalamazoo ensures meetings are open and available to the public.

52. Plaintiff's service dog, Mazie, is his lifeline, providing him with the support he needs to navigate life and manage his disability.

53. In his championing of policies for transparency and disability rights in Kalamazoo, Mr. Stanley became known for challenging a City with a history of discrimination and deep-seated bureaucracy.  The support of the city's downtrodden inspired Plaintiff to run for City Commissioner in 2019, County Commissioner in 2020, Kalamazoo Mayor in 2021, and State Representative in 2022.

54. Mr. Stanley's desire to make Kalamazoo work for all people caused Mr. Stanley to become a thorn in the side of City government and the bloated bureaucracy that feeds off of City government and caused Defendants to retaliate.

55. Defendants intentionally tarnished his reputation, alienated him from his community, and endeavored to drive him out of Kalamazoo, all because he simply tried to protect himself and others in the community from harm, engaged in his position as a Parks Board member, and sought to support the people of Kalamazoo.

56. The constant deliberate discrimination has destroyed Plaintiff's reputation and caused him to become isolated from those communities and people who viewed him as a champion and hoped to see him bring change to Kalamazoo.  This destruction persists to this day.

57. Defendants treat Plaintiff as a thorn in their side because Plaintiff requests Defendants comply with the law, enforce the law, protect people's basic rights, and because he dared run for Mayor against the current officeholder.

58. In response, Defendants have taken extraordinary steps to prevent Plaintiff from accessing government buildings, agencies, individuals, and meetings open to the public, as well as doing their utmost to prevent Plaintiff from accessing public records and participating in the civil and political process.

59. Mr. Stanley simply sought to expose the hypocrisy and contradictions underlying many of Defendants actions.

60. Defendants' constant harassment and intentional infliction of suffering upon Plaintiff have made it unbearable for Plaintiff to live in Kalamazoo, let alone avail himself of the public spaces and services of the City.

61. The constant emotional pain has broken Mr. Stanley's spirit and turned him from an enthusiastic community advocate to a reclusive person, filled with fear and disgust.  The City's attacks are two-fold: debasing Mr. Stanley because of advocacy and disability status,

then targeting him as a vicious political threat, when all Mr. Stanley has asked for is compliance with the law.

62. In one of the City Defendants most recent actions against Plaintiff, the City issued a criminal summons against Mr. Stanley on September 19, 2023, related to Mr. Stanley's attempt to turn in signatures to run for public office on or about July 19, 2023.

63. Mr. Stanley's attempt to participate in the political process caused the City Defendants to allege a violation of an unlawful no-trespass order, was served despite Plaintiff being expressly invited by the City Manager's Office on City property to file such documents. Security then assaulted Plaintiff by physically shoving him to keep him from entering the building and stating, "it's my job to keep you out."[1]

64. In retaliation for Mr. Stanley's assertion of his First Amendment Right to engage in the political process and for Mr. Stanley's attempt to file a police report against the Security Guard, the City and KDPS Officers retaliated against Mr. Stanley by issuing him a criminal trespass citation.

65. Defendants' actions have also caused Plaintiff to be blacklisted for employment, not only for positions with the City of Kalamazoo, but for practically every job in the surrounding area.

66. Rather than work with Plaintiff, the Defendants have engaged in a deliberate and coordinated pattern of intimidation and harassment to prevent him from accessing city services and events. Defendants' retaliatory actions include, but are not limited to, making a fraudulent petition to commit Plaintiff to a mental institution simply to damage him politically while running against Defendant and current mayor, David Anderson; enacting

---

[1] Counts 56-59 contain facts related to Count 9.

city-wide policies and practices targeting Plaintiff; implementing a pre-textual and unlawful trespass to keep Plaintiff from accessing public property and events; refusing Plaintiff's criminal complaints for (and refusing to investigate), violations of service dog laws and to report various threats against himself and vandalism to his property; ignoring countless of Plaintiff's lawful FOIA requests; and refusing Plaintiff's complaints against individual KDPS officers who had engaged in malfeasance or refused to carry out their duties.

67. All City Defendants, in one form or another, have acted against Plaintiff to prevent him from accessing city services, advocating for those with disabilities, exercising his rights under State and Federal laws, and exercising his First Amendment rights.

68. Defendants relentless and corrupt behavior has caused Plaintiff to live in constant fear of retaliation from Defendants and anyone who may be associated with them.

69. Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

70. Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

71. Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

72. Defendants are a model to private businesses and establishments.  By failing to follow the law and protect Plaintiff and other similarly-situated individuals from discrimination, Defendants put the community's health and safety at risk, and create a system and culture in Kalamazoo where public and private establishments can act with impunity to deny access to those who have disabilities and those who use a service dog.

73. Defendants' actions (and in some instances omissions), have created a hostile environment for Plaintiff and the disabled in the City of Kalamazoo, in both public municipal settings and in private business establishments.

74. Due to Defendants relentless pattern of retaliation, Plaintiff was afraid to run for office in 2023, for fear of further retaliation, property damage, threats of violence, acts of emotional distress, and social isolation stemming from Defendants retaliation.

75. Plaintiff can no longer access city services without fear of arrest or further discrimination and can no longer call the Kalamazoo 311 hotline using his real name.

76. City Defendants have falsely encouraged and/or pressured City employees to make complaints against Mr. Stanley in order to support unlawful and retaliatory trespass orders.

77. Defendants' actions have damaged Plaintiff's reputation in the community.

78. Plaintiff received threats as a direct result of Defendants' treatment of Plaintiff and the perceptions Defendants created that Plaintiff was sub-human and could be treated poorly with no repercussions.

79. As a result of his damaged reputation, Plaintiff struggles to find meaningful employment in Kalamazoo.

80. Defendants' discrimination against Mr. Stanley and those with disabilities has resulted in an inability to avail himself the property tax review process and obtain a tax exemption he qualified for in 2023.

81. Defendants abused their authority under color of law to target and retaliate against Plaintiff for his disability status; his use of a service dog; his advocacy on behalf of the disabled; his exercise of his First Amendment rights; his advocacy for government transparency, including the right to free expression; political engagement; and civic participation.

13

82. The emotional toll of fighting these battles with the City has caused Plaintiff great mental anguish.

83. With Bronson Methodist Hospital and ISK, Plaintiff attempted to receive care for a hoarding condition.

84. When Plaintiff sought assistance from ISK for his condition, he was informed he must be admitted twice to a mental health facility for in-patient treatment.  When Plaintiff questioned ISK's self-imposed conditions, unbeknownst to Plaintiff, ISK and Plaintiff's political opponent utilized the request for assistance with hoarding and subsequent conversation to fraudulently seek a court order for a mental health evaluation.

85. While ISK orchestrated the fraudulent demand for a mental health evaluation, Plaintiff had travelled to Bronson to seek admission in order to qualify for ISK's support in combating hoarding, per ISK's instructions.

86. At Bronson, Plaintiff explained his reason for seeking admission, informing Bronson of ISK's stated requirements.  Bronson staff and employees instructed Mr. Stanley to remove his clothing for an evaluation.  Unbeknownst to Mr. Stanley, Bronson staff and employees removed his clothing from the room during the evaluation process.

87. Bronson staff and employees indicated Plaintiff could not have his service dogs with him in the emergency room, and informed Mr. Stanley that if he were admitted to Bronson, he would have to relinquish possession his service dogs.  When Mr. Stanley sought to end his evaluation, Bronson staff and employees delayed his discharge, contacted KDPS, hid Mr. Stanley's clothing (alleging they were "lost"), and physically prevented him from leaving the hospital.  Bronson staff held Mr. Stanley at the hospital on behalf of KDPS and refused to discharge Mr. Stanley despite his request.

88. Defendants Bronson, ISK, ISK Employee Valerie Storey, Bronson Physician John Doe, Bronson Security Guard John Doe 1, Bronson Security Guard John Doe 2, Unknown Bronson Hospital Staff, targeted and retaliated against Mr. Stanley for availing himself of healthcare services afforded by ISK and Bronson, which would have substantially improved his life; for Mr. Stanley's use of a service dog; and because of his disability.

89. Plaintiff attempted to serve the Kalamazoo Public Schools (KPS) Board of Education with legal documents just prior to a public Board meeting on April 6, 2023.  Mr. Stanley intended to join for the remainder of the meeting as a member of the public to speak in support of the disabled during public comment.

90. Upon entering the KPS Administration building, KPS Security physically shoved Mr. Stanley and prohibited him from continuing with his service animal.  When KPS' Attorney, Marshall Grate, arrived to address the commotion, Attorney Grate asked Mr. Stanley unlawful questions about his disability and his service animal.

91. Rather than simply allow Plaintiff to carry out a lawful duty to serve the KPS Board members and advocate on behalf of the disabled, Defendants KPS, Marshall Grate, KDPS, and KPS Security, harassed Mr. Stanley because of his service dog, effectively denying Mr. Stanley full and equal access to a place of public service due to his disability.

92. The Kalamazoo Public Library has also harassed, discriminated against, and retaliated against Mr. Stanley for his attempts to access and discuss library service dog policies.

93. When Mr. Stanley respectfully requested the Library become current with their service dog policies, Defendant Ryan Weiber (former Kalamazoo Public Library Director), targeted and retaliated against Mr. Stanley by having Library staff contact KDPS and falsely allege

Mr. Stanley was in an "employee-only" section of the library to fraudulently effectuate a trespass against Mr. Stanley.

94. Defendants Kalamazoo Public Library, Ryan Wieber, and Terry New (current Library Director) enforced this fraudulent and pretextual trespass against Mr. Stanley for an entire year, preventing him from accessing public services at the Library because of Mr. Stanley's advocacy for the disabled and his use of a service dog.  For the duration of his trespass, Mr. Stanley could not borrow materials online nor arrange for a friend or family member to physically pick up library materials for him.

95. Recently, the Kalamazoo Board of Review for Assessments, Kalamazoo City Assessor's Office, and City Assessor Aaron Powers, denied Mr. Stanley the opportunity to apply for a poverty exemption on his property taxes, because Defendants did not maintain an accessible public meeting notice and did not respond to Mr. Stanley's requests for information regarding the July Board of Review meeting.  Defendants' actions caused Mr. Stanley to miss the opportunity to present his case for the exemption.  Defendants' failure to abide by the law, provide accessible meeting notices, and respond to his information request prevented Mr. Stanley the full and equal enjoyment of a public service.

96. Plaintiff filed this charge because he believes something must be done to end this discriminatory and other unlawful behavior.

*THE GENESIS—FACTS RELATED TO COUNTS 1-5 AND 7-10.*

97. Plaintiff incorporates the previous paragraphs as if contained herein.

98. In 2021, Mr. Stanley ran for Mayor with the goal of making Kalamazoo a more inclusive, aesthetic, and accessible city.  Plaintiff's campaign focused on government transparency, community mental health issues, and advocacy on behalf of those with service dogs.

99. On September 24, 2021, amid Plaintiff's campaign for Mayor, a fraudulent petition was orchestrated to involuntarily commit Plaintiff to a mental institution.  This event was the catalyst to years of persistent retaliation against Mr. Stanley, especially by the City and Defendant David Anderson and his following.

100.    On September 23, 2021, Mr. Stanley called Integrated Services of Kalamazoo (ISK), the Kalamazoo Community Mental Health (CMH) organization to seek support for a hoarding condition that impaired his quality of life.

101.    ISK informed Plaintiff that he could not qualify for support with ISK unless he had a qualifying diagnosis.

102.    ISK further instructed Plaintiff that he could only receive a qualifying diagnosis as an inpatient at a mental health unit.  When Plaintiff asked what that required, the ISK staff stated that inpatient services require a patient have an imminent plan to hurt themselves or hurt others.

103.    Plaintiff, skeptical of this advice, sought clarification of the ISK staff person's position.  He repeated their criteria back to them, and asked whether ISK was claiming that Plaintiff would not qualify for support unless he had an imminent plan to hurt himself or others.

104.    ISK informed Plaintiff that his understanding was correct, then also warned that he should "not speak that way," despite Plaintiff simply repeating back ISK's stated requirements.

105.    Mr. Stanley was frustrated by the pushback from ISK staff, considering the purpose and intent of ISK to provide the Kalamazoo community with broad mental health

resources, including those such as hoarding which negatively impact an individual's quality of life.

106.     While the conversation frustrated and discouraged Plaintiff, he never indicated he had a plan to hurt himself or others.  Although he expressed himself intensely on this call, Mr. Stanley was simply frustrated trying to communicate his desire to use the ISK system to improve his quality of life.  ISK notably offers service for behavioral challenges related to mental health, such as providing assessment, evaluation, and eligibility screening for special services.[2]  Mr. Stanley was simply trying to use the ISK system in the way it is offered and publicized.

107.     Plaintiff had limited treatment options as a recipient of Medicaid.  He found ISK's requirement absurd, but ultimately knew it was the only provider accessible to him.

108.     Based on ISK's statements, Plaintiff sought admission to Bronson Hospital on or around September 24, 2021, to receive a qualifying diagnosis for treatment with ISK.

109.     Plaintiff entered the emergency room with his service dogs and was brought to a patient room for evaluation.

110.     A medical professional entered the patient room and directed Plaintiff to change into a hospital gown and provide all of his possessions to the hospital, including his dog leashes and cellphone.  A series of medical professionals and hospital staff then visited Plaintiff as part of the evaluation.

111.     Initially, the hospital staff and the security guards were cordial to Mr. Stanley, and even offered to bring his dogs water.

---

[2] *See* https://iskzoo.org/our-services/mental-illness/; *See also* MCL 330.1001 *et seq*.

112.    After momentarily leaving the room and returning, their attitudes suddenly changed, and the guards appeared suspicious of Plaintiff and his service dogs.

113.    After changing into the hospital gown, and unbeknownst to Plaintiff, hospital staff removed his clothing from the evaluation room against hospital policy.

114.    The two security guards who had initially stopped by the patient room then remained there for almost the entire evaluation process.

115.    Upon information and belief, Bronson learned of the court order and began coordinating with KDPS to detained Mr. Stanley.

116.    When the physician came into the evaluation room, he asked Mr. Stanley "what's with the dogs?"  Mr. Stanley conveyed that they were service dogs.  The physician explained that the dogs were not permitted in the emergency room.  When Mr. Stanley's dog yawned, the physician falsely claimed the dog growled.  Mr. Stanley then asked to review the hospital policy for service dogs.

117.    When Plaintiff asked for a copy of hospital's service dog policy, hospital staff reluctantly provided it to him.

118.    Plaintiff only had the policy in his hand for a few minutes before staff grabbed it away.

119.    Mr. Stanley, fearful that Bronson was trying to separate him from his service dogs, explained his rationale for seeking voluntary admission, including the fact that ISK informed Mr. Stanley that admission was the only way he could receive treatment.  Mr. Stanley tried to explain that he had no other viable options for treatment.

120.    Notably, the Social Worker in the evaluation room agreed that Mr. Stanley did not require admission, but that Mr. Stanley was understandably trying to figure out how to use the resources available to him for assistance.

121.    Unable to be separated from his service dogs, Plaintiff requested a discharge. Plaintiff also alerted local law enforcement to report a criminal violation of service dog laws.

122.    Plaintiff began looking for his clothes, only to be told by a staff member that his clothing was "lost."

123.    At this point, the tension in the patient room was palpable.  Plaintiff's fears intensified as he realized Bronson hospital staff had effectively imprisoned him by denying him his clothing.

124.    Plaintiff continued to assert his desire to leave the facility and be discharged and was denied even after he ultimately received discharge papers.

125.    Plaintiff eventually exited the patient room in his hospital gown, as staff allegedly still could not locate his clothing.  Hospital staff tried to prevent Mr. Stanley from leaving until they could "find" his clothes.

126.    Plaintiff attempted to leave the hospital from the main emergency room doors. Security guard John Doe 1, approached and placed his fingers behind the door's "handicap button" to prevent Plaintiff from hitting the button and physically leaving.  The doors would not open unless the button was activated.

127.    Upon information and belief, Security Guard John Doe 1 was instructed to keep Mr. Stanley in the hospital.

128.     Ultimately, Plaintiff was in the evaluation room over forty-five minutes and held at the hospital before finally being able to leave the building.  Mr. Stanley was only able to exit once another staff member opened the doors to move a patient bed, and Mr. Stanley was able to follow after.

129.     Bronson humiliated Mr. Stanley by forcing him to leave in a backless hospital gown.

130.     Immediately after Mr. Stanley exited the hospital, a staff member approach him with his clothes, stating incredulously that they "found them."

131.     As Mr. Stanley exited Bronson, a police car with two officers arrived.  Mr. Stanley believed the officers arrived to help him in response to his report, and Mr. Stanley began to explain what had happened inside Bronson with his dogs.  Officers John Doe 3 and John Doe 4 started listening to Plaintiff, and seemed to agree that Mr. Stanley's dog was not vicious or otherwise aggressive.

132.     Mr. Stanley then started to make a verbal complaint to the Officers regarding the treatment at Bronson, when Sgt. Khillah arrived and pulled the officers aside to talk.  Sgt. Khillah then approached Plaintiff to inform him that he had a petition from Court to commit Plaintiff to a mental hospital and that he would take over the complaint.

133.     Sgt. Khillah's partner then told Mr. Stanley to stop recording them and ordered him to move away from the officers.

134.     The petition was allegedly based on Plaintiff's September 23, 2021, call to ISK during the conversation segment where they discussed requirements for obtaining a qualifying diagnosis for ISK.

135.      ISK improperly "conveyed" Plaintiff's phone conversation – so that only a portion

of his clarifying questions were conveyed – and alleged that Plaintiff was making threats.

136.      ISK then used this misleading portion of the conversation to petition the court to

admit Plaintiff against his will.

137.      Plaintiff was denied a copy of the petition for himself and denied an opportunity to

seek court intervention.

138.      Sgt. Khillah then escorted Plaintiff to the back of his partner's police car and had

his partner bring Mr. Stanley to Borgess Hospital.  His partner's demeanor made Mr.

Stanley fearful.  When Mr. Stanley expressed his concern about his commitment being

retaliation against him for running for mayor, the officer fell silent.  Ultimately, however,

the officer continued to take Mr. Stanley to Borgess.

139.      Outside Borgess, Sgt. Khillah spoke with Plaintiff and said he did not believe that

Mr. Stanley's service dogs were legitimate, because they needed a vest or license; a

misstatement and a violation of Michigan law.

140.      Sgt. Khillah had no authority to make such conclusions, despite trying to feign his

expertise and assert his authority over Mr. Stanley.

141.      Upon information and belief, the City and KDPS used Sgt. Khillah as the

"spokesperson" and authority figure to force Mr. Stanley into compliance, knowing Mr.

Stanley would assert his rights under the ADA, PWDCRA, Elliot-Larsen Civil Rights Act,

and other laws related to disability protections.

142.      The officers also told Plaintiff his dogs would not be allowed in the hospital because

Plaintiff would be in a locked facility.

143.     Sgt. Khillah conspired with hospital staff in violation of law and his oath to uphold

the law, to prevent Plaintiff from having access to his service animal at Borgess hospital.

144.     Sgt. Khillah threatened Mr. Stanley that if he could not find someone to take his

service dogs, the police would have to take them "to the pound."

145.     Sgt. Khillah threats forced Mr. Stanley to choose between giving up his rights or

face consequences for asserting his rights.

146.     Sgt. Khillah's violated Plaintiff's rights under the color of law.

147.     In response, Plaintiff frantically tried to reach his friends and relatives to come get

his service dogs, but Plaintiff was unable to reach anyone who could get his dogs

immediately at that late hour.

148.     Plaintiff's sister ended up driving down from Grand Rapids, almost an hour away,

and a local friend arrived around the same time Plaintiff's sister arrived.

149.     While Mr. Stanley waited for a friend or family to help, Sgt. Khillah continued

pressuring Mr. Stanley to dispose of his dogs.  Sgt. Khillah told Mr. Stanley he could not

bring his dogs into the hospital.  Plaintiff insisted he would not voluntarily leave his dogs

behind.  When Mr. Stanley asked Sgt. Khillah what would happen if he kept his dogs with

him, Sgt. Khillah told Mr. Stanley the police would have to "give them to the pound" if his

family did not come.

150.     It became clear to Mr. Stanley that he had been targeted by Defendants ISK,

Bronson, City of Kalamazoo, KDPS, and all individual Defendants associated with the

September 24, 2021 incident, and that those Defendants weaponized Mr. Stanley's

disability against him, at minimum, to prevent him from using and enjoying public

services, public accommodations, running for mayor, and to discriminate and retaliate against him.

151.    After Plaintiff was released from the hospital after an evaluation and went to his sister's house, he found his dogs shaking and despondent.

152.    Plaintiff's dogs refused to eat during the entire encounter from when they were separated from him at Bronson Hospital.

153.    The dogs had not been separated from Plaintiff before and showed clear signs of distress and trauma which lasted for months after the incident; thus reducing their effectiveness as service animals and causing Plaintiff stress, anxiety, and other trauma.  To the present day, Mr. Stanley's dogs still show signs of trauma and anxiety when separated from Plaintiff.

154.    On or about January 5, 2022, Plaintiff sought to contact Bronson's ADA (PWDCRA) Coordinator to discuss the September 24, 2021, incident.

155.    Plaintiff asked for help at the Main Campus Front Desk and was directed to the Customer Service station.

156.    The Customer Service Station was unfamiliar with the concept of an ADA (PWDCRA) Coordinator.   Plaintiff explained the function of an ADA (PWDCRA) Coordinator to the staff, and they directed Plaintiff to the administrative building.

157.    The Customer Service station made Mr. Stanley call a "customer support" number, which ended up being a media relations specialist, who did not know how to assist him.

158.    Plaintiff then went to the administrative building to request to speak to an ADA (PWDCRA) Coordinator, after the three (3) separate phone numbers provided to him by the Customer Service station did not work.

24

159.     Plaintiff spoke to the administrative staff from the intercom outside, during a winter storm warning, and explained he would like information about how to contact the ADA (PWDCRA) Coordinator.

160.     He was directed to wait outside while the staff contacted the appropriate person.

161.     Plaintiff asked if he could wait inside because of the extreme frigid weather, but was told to remain outside.

162.     Plaintiff complied, and was surprised when he was approached by security, rather than the ADA (PWDCRA) Coordinator.

163.     Plaintiff asked if the staff had called security, and the administrative staff member confirmed that she had contacted security instead of the ADA (PWDCRA) Coordinator and insisted that Plaintiff follow the instructions of security.

164.     Security instructed Plaintiff to leave immediately.   Plaintiff complied with security's request to peacefully leave the campus.

165.     Upon information and belief, the City and Kalamazoo Department of Public Safety, who had "successfully" used the trespass tactic against Mr. Stanley in the past, informed Bronson that the campus could use this avenue to prevent Mr. Stanley's access to its property.

166.     Bronson then claimed to issue a no-trespass order against Plaintiff in retaliation for his attempts to speak to the ADA (PWDCRA) coordinator and lodge a complaint regarding Bronson's discrimination against the disabled, refusal to allow a reasonable accommodation related to his use of a service animal, lawfully navigate their medical system, and advocate for his rights as a disabled person.

167.     Defendants interfered with Plaintiff's Constitutional rights and rights conferred to Plaintiff through Federal and State laws, causing Plaintiff physical and mental harm in the aftermath of the September 24, 2021, incident.

168.     Defendants' retaliation towards Plaintiff has persisted, as various Kalamazoo employees, including Defendant Anderson's subordinates, executed discriminatory policies and directives directed only at Plaintiff, to keep him from exercising his rights on public property, to prevent his use and enjoyment of public services, to target him as a disabled individual, and to coerce him to cease advocating on behalf of those who are disabled and those with service dogs.

169.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

170.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

171.     Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

## KDPS RETALIATION

*FACTS RELATED TO COUNTS 1-5, 7, 9, AND 10*

*KDPS Unequal Treatment*

172.     Plaintiff incorporates the previous paragraphs as if contained herein.

173.     Due in part to Plaintiff's engagement in the community, KDPS's prevalence at public events and meetings, and Plaintiff's reliance on KDPS to enforce service dog laws and policies, and his constitutional rights, many officers know Plaintiff.

174.     Notwithstanding, officers who have never interacted with Plaintiff know of Mr. Stanley, further evincing the existence of a conspiracy to target Plaintiff and the development of policies to keep Plaintiff from availing himself of city services because of his advocacy on behalf of the disabled and those who use service dogs.

175.     KDPS has carried out retaliatory directives from City officials to prevent Plaintiff's access to public property, events, and information.  KDPS officers know, or should have known, that the City officials' directives and requests for police intervention are unlawful and in violation of State and Federal laws, policies, and the Michigan and U.S. Constitutions.  Despite this knowledge, they do so anyway.

176.     KDPS officers have implied that Plaintiff "is asking for it," in reference to using a service dog, to justify law enforcement's harassment and unequal treatment of Mr. Stanley.

177.     KDPS officers, sergeants, captains, chiefs, lieutenants, executive branch officers, Township police, State police, and City prosecutors have also conspired to refuse Plaintiff's criminal complaints and complaints against individual officers.

178.     KDPS has also frequently harassed Plaintiff by selectively enforcing laws against Plaintiff and threatening to arrest Plaintiff at public events.

179.     KDPS's retaliation is based in whole or in part upon Plaintiff's insistence that KDPS enforce service dog laws.

180.     One such example of KDPS's retaliation occurred on September 7, 2021, when Officer Joshua Pena cited Plaintiff for having his dog off-leash in Fairmount Park.

181.     Officer Pena alleged that Plaintiff's dog was off-leash in violation of park rules and allegedly chased after another person.  It was not, in fact, unlawful to have a dog off-leash

in the park.  The dog was not "chasing" another person, but was interacting with one of Mr. Stanley's friends as play activity and exercise.

182.     Officer Pena had also threatened to arrest Plaintiff for sitting on a park bench in the past, arguing it was a violation of City Ordinance to "lay down" or "rest" on a park bench, and that sitting constituted "resting."

183.     At the time, the City did not have an ordinance regarding these alleged "rules."

184.     The only policy the City maintained, was that anything the Park Director said, maintained the force of law, which constituted an unlawful and broad delegation of legislative authority to the Park Director.

185.     During his interaction with Plaintiff, Officer Pena also mocked Mr. Stanley, making a statement to the effect of,  "You can change the rules once you become mayor" (a reference to Plaintiff's failed attempt to become mayor).

186.     Plaintiff made a complaint regarding Officer Pena's December 7, 2021, citation which ended up before the Citizen Public Safety and Review Board.

187.     During the hearing, Plaintiff noted there was no regulation about off-leash dogs for Fairmount Park at the time of the incident.  There is still no regulation about off-leash dogs for Fairmount Park.

188.     Despite overwhelming evidence that his service animal had not "chased" anyone, and he was complying with the laws then in effect, and proof that Officer Pena knew or should have known he had no reason to ticket Plaintiff, the Board exonerated Officer Pena.

189.     Plaintiff played officer body camera footage which showed his dog was not chasing anyone, but instead, was trotting towards Plaintiff's friend as the friend walked away.

190.     Notably, Plaintiff's dog immediately complied when Plaintiff called her back.

191.     The Citizen Public Review Board exonerated the officer, despite Plaintiff's evidence that the police officer acted improperly by issuing a criminal citation, even though there was no rule or regulation broken.

192.     While the Citizens Complaint Committee meeting always includes time for public comment, in an attempt to silence Plaintiff (in the exercise of his first amendment rights), Plaintiff's appeal was the ONLY meeting that did not include time for public comment.

193.     Every other meeting over the last several years for the Citizens Complaint Committee included public comment in their agenda.

194.     The Citizens Complaint Committee's selective removal of public comment violated Plaintiff's and his supporters' First Amendment Rights and was done in retaliation for Plaintiff asserting his rights to his service animal.

195.     On December 1, 2021, KDPS retaliated against Plaintiff by threatening to arrest him for trying to access a press conference for the Michigan State Police, even though Plaintiff, through his First Amendment Right and his online coverage of various matters of public interest, was a member of the press.

196.     No other member of the press was excluded from the press conference.

197.     KDPS' actions were in violation of Plaintiff's First Amendment Rights and in retaliation for Plaintiff's advocacy on behalf of the disabled and the use of service animals.

198.     During that press conference, KDPS Officer John VanOosterum was determining who was authorized to enter and attend the press conference.

199.     When Plaintiff got in line for the conference, Officer VanOosterum became heated, aggressive, and raised his voice at Plaintiff, threatening if he took another step forward, VanOosterum would place Plaintiff under arrest for attending the meeting.

200.     Officer VanOosterum slammed the door in Plaintiff's face.

201.     KDPS wanted to separate Plaintiff from his service dog by unlawfully arresting Mr. Stanley, a tactic KDPS has used in the past.

202.     KDPS and Mayor David Anderson claimed that Plaintiff was not "licensed media."[3]

203.     The Mayor then alleged he would "check" to see if Plaintiff could attend the meeting, but never followed up.

204.     Plaintiff feared for his safety knowing KDPS would not allow him to keep his dog with him if arrested.

205.     Plaintiff was told repeatedly there was a "list" of media allowed into the press conference, and that he was not part of the list.

206.     When Plaintiff submitted a FOIA request for the alleged list, the Records Bureau responded that the document did not exist.

207.     Defendants' purposeful exclusion violated Plaintiff's First, Fifth, and Fourteenth Amendment rights, as well as constituting PWDCRA discrimination and retaliation.

208.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

209.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

210.     Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

---

[3] U.S. Const. amend. I; MCLS Const. Art. I, § 5.

211.     Plaintiff attempted to file a complaint against Officer VanOosterum on the day of

the press conference.

212.     Plaintiff requested a paper copy of the complaint form at the KDPS front desk, but

the employee at the front desk alleged, indignantly, that he didn't know anything about

paper copies of complaint forms.

213.     Plaintiff had filed paper complaint forms in the past.

214.     In fact, KDPS has historically provided paper complaint forms.

215.     When challenged, the employee finally, and reluctantly, turned around, reached

behind him, and "found" a paper copy.

216.     On December 14, 2021, Plaintiff filed a formal complaint against Chief of Police,

Vernon Coakley, for discrimination and harassment.

217.     KDPS never responded to his complaint, nor investigated the allegations.

218.     Notably, Defendant Coakley left his position January 1, 2023, because of other

discrimination and misconduct allegations.

219.     On January 31, 2022, the City threatened to arrest Plaintiff for trying to attend a

public meeting in City Hall for the Foundation for Excellence, who had anonymously

received a $500,000,000.00 donation.

220.     The Deputy City Manager's Chief Operating Officer asked Security Officer

Charles Perkins to call 911.

221.     Former Commissioner Jeanne Hess witnessed the events and allowed them to occur

without intervention.  She noted it was not a law, but that regardless, she did not want Mr.

Stanley at the meeting any.

222.     When Dispatch responded to Perkin's call, they asked if Plaintiff was in an employee-only section of the building, to which Perkins lied and said yes. When Dispatch asked if Mr. Stanley was currently trespassed, Perkins, laughing, stated that Mr. Stanley was not trespassed yet, but that the "City was working on it."

223.     Plaintiff was never in an employee-only section of the building.

224.     Perkins also complained that Plaintiff did not have a face mask.

225.     However, the face mask policies at the time of the incident were only a recommendation and not a requirement.

226.     Upon information and belief, KDPS maintains no ADA (PWDCRA) coordinator, in violation of law.

227.     The Commissioners' and Security Officer Perkins' actions caused Plaintiff to miss out on the full enjoyment of his right to attend a public meeting and forced him to interact with the police in fear of being arrested or otherwise detained and the fear of losing access to his service animal or having them placed in the pound.

228.     These are just a handful of examples of KDPS's retaliation against Plaintiff. On a regular basis, KDPS acts with malice towards Plaintiff and singles him out because of his advocacy.

*KDPS Refusing to Investigate Plaintiff's Concerns*

229.     KDPS also discriminated against Plaintiff by refusing to perform simple, routine investigations.

230.     Plaintiff contacted KDPS multiple times to perform an investigation when his property was vandalized, including when someone smashed in several of Plaintiff's windows on both the front façade and the side of his home.

231.     KDPS has also refused to investigate incident where Mr. Stanley had been physically assaulted.

232.     Last year, Plaintiff reported to KDPS that someone vandalized his truck and slashed his tires.

233.     KDPS initially refused to investigate because Plaintiff's truck was allegedly "not on his property."

234.     Plaintiff told KDPS that his neighbor's Ring video footage definitely captured the incident.   Notably, the City has a contract with Amazon to provide these Ring video cameras to residents.   KDPS routinely and openly would review footage from the Ring video cameras in investigations against the police and for investigations into potential criminal activity in the community.

235.     Defendant KDPS refused to do a thorough investigation, even though a cursory review of the neighbor's Ring video footage would have clearly shown who was responsible.

236.     A KDPS officer alleged that Mr. Stanley's truck was parked not on his own property, and that somehow, this meant KDPS had no responsibility to investigate further.

237.     KDPS refused to investigate Plaintiff's complaints of property vandalization and destruction, in retaliation for Plaintiff's advocacy on behalf of the disabled, demands for City transparency, and for Plaintiff's campaigns for public office.

238.     In July 2022, KDPS issued a parking violation against Plaintiff for a parking law that Plaintiff's neighbors, including a County Commissioner who sits on the City of Kalamazoo's Downtown Economic Growth Authority, violated daily without consequence.

239.     In August 2022, KDPS ignored Plaintiff's attempts to direct law enforcement to the site of a shooting; choosing to mock him instead of listening to his complaint.

*Refusal to Accept Plaintiff's Criminal Reports of MCL 750.502c*

240.     MCL 750.502c makes it a crime for a place of public accommodation to ask about a person with a disability's disability, require medical documentation, request medical records, require a special identification card or training documentation for the service animal, or ask that the service animal demonstrate its ability to perform work or a task.

241.     Various public accommodations in Kalamazoo have asked Plaintiff unlawful questions regarding his disability and his service animal, beyond that permitted by law.

242.     As part of Plaintiff's advocacy, and for his own health and safety, Plaintiff has invoked his rights under MCL 750.502c by filing criminal complaints when places of public accommodation have violated this section of the penal code.

243.     Defendant KDPS unilaterally stopped accepting criminal complaints from Plaintiff regarding public accommodations and service dogs.

244.     KDPS's refusal to enforce MCL 750.502c has made it impossible for Plaintiff to ensure that places of public accommodation, such as restaurants, stores, libraries, City Hall, etc., provide him and the disabled with equal services.

245.     This decision to stop accepting Plaintiff's complaints was a result of a coordinated effort within KDPS and between City/other City officials.

246.     Plaintiff filed several reports of MCL 750.250c violations.

247.     In total, approximately thirty officers told Plaintiff he could no longer file complaints for violations of MCL 750.250c. In fact, KDPS officers informed Plaintiff he

could no longer file *any* complaints with the Department, including assistance in removing people from his own property.

248.     One such officer was KDPS Officer David Juday, who told Plaintiff he could not file a complaint for MCL 750.502c with KDPS on October 2, 2021.

249.     After several KDPS officers refused Plaintiff's criminal complaints, Plaintiff sought to discuss the issue with multiple KDPS Captains.

250.     During their discussion, one such KDPS Captain told Plaintiff that any further complaints must be filed with the City attorney, rather than KDPS.

251.     In response, Plaintiff inquired to the City attorney about KDPS's refusal to accept Plaintiff's complaints.

252.     The City Attorney, Clyde Robinson, told Plaintiff that KDPS could not refuse complaints, as it was part of Plaintiff's civil rights.

253.     After discussing his rights with the City Attorney, Plaintiff again attempted to file a complaint and was again rejected by KDPS, despite explaining the City Attorney's position.

254.     KDPS officers repeatedly refused to defend Mr. Stanley's right to bring his service dog into various public places and deflected by telling Plaintiff to "call the Attorney General," rather than perform their obligations to enforce service dog laws.

255.     City Attorney Clyde Robinson was well aware KDPS told Mr. Stanley to go elsewhere, but never acted to rectify the situation or clarify the law with KDPS.

256.     Such actions put Mr. Stanley's health and safety in danger, as he constantly had to fend off discriminatory and unlawful practices by places of public service and

accommodation because KDPS refused to enforce the law, compelling Plaintiff to seek this instant action to enforce MCL 750.502c.

257.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

258.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

259.     Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

## DEFENDANTS CITY OF KALAMAZOO AND MAYOR'S OFFICE CONTINUED RETALIATION, CONSPIRACY, AND TARGETING OF PLAINTIFF

*FACTS RELATED TO COUNTS 1 2, 4-6, 8, AND 10*

260.     Plaintiff incorporates the previous paragraphs as if contained herein.

261.     Through Plaintiff's ordinary use of city services, many City employees and officers know Plaintiff, and got to know him better after he became involved in local politics.

262.     During Plaintiff's general tenure as an advocate, and for the aid of his disability, Plaintiff has been accompanied by a service dog and/or a service dog in-training.

263.     After various encounters with Plaintiff and his dog, the City, the City Manager, the then-Park Director (Sean Fletcher), the Mayor, and his subordinates, created a policy, or series of policies, to prevent Plaintiff from bringing dogs onto City property.

264.     Notably, this policy, or series of policies, were enacted shortly after the City Manager threatened to punch Mr. Stanley in the face for coming to a scheduled, in-person meeting to discuss Plaintiff's engagement in city affairs, and shortly after Shelly Dusek

made a fraudulent formal complaint against Plaintiff, falsely alleging that Plaintiff committed a hate-crime against a security guard.  Ms. Dusek tried to deceive Plaintiff into filling out a form that would force Plaintiff to falsely admit to committing a hate crime.

265.     This City created this policy, or series of policies, on or around February 2022.

266.     The City created this policy, or series of policies, for the sole purpose of fabricating a basis to arrest Plaintiff, harass Plaintiff, and instill mental anguish.

267.     The City created this policy, or series of policies, to criminalize Plaintiff and trap him into unwillingly violating the law.

268.     The City created this policy, or series of policies, to intentionally target Plaintiff.

269.     Once the policies came into effect, the Kalamazoo Director of Parks and Recreation personally sent Plaintiff an email telling Plaintiff to refrain from bringing his dogs to public meetings.

270.     On March 4, 2022, Defendant City of Kalamazoo issued a trespass against Plaintiff based on the illegitimate and pre-textual policies targeting Plaintiff.

271.     The trespass served no basis for the City other than to fabricate a foundation to arrest Plaintiff, harass Plaintiff, and instill mental anguish.

272.     The City did not base its trespass on legitimate concerns of harassment or behavior reported by city employees, despite the alleged (and fraudulent) "rationale" offered in the official trespass letter.

273.     The trespass served only to intimidate Plaintiff and cause him mental anguish and cause psychological manipulation.

274.     The trespass prevented Plaintiff from accessing city services and put in him in fear
of arrest and separation from his service animal, further harassment of Plaintiff, and to
instill mental anguish.

275.     In July 2023, the City once again trespassed Mr. Stanley's for another year in further
retaliation against Mr. Stanley's advocacy.  On top of that, to effectuate the trespass, City
repeatedly and aggressively sent numerous KDPS officers in a police cruiser to provide
Plaintiff notice of the trespass, after he already received a copy, using unnecessary force
and displaying an alarming persistence and obsession.  One officer went so far as to insert
the paper into Plaintiff's mailbox, a violation of federal law.[4]

276.     Defendants City of Kalamazoo and City Manager's Office and City security further
retaliated against Mr. Stanley by issuing a criminal summons against Plaintiff on
September 19, 2023, despite having invited him onto City property to submit documents
to run for office.

277.     In July and August 2022, Plaintiff was targeted by City Commissioner Esteven
Juarez for discussing threats being made against Plaintiff.  Defendant Juarez is very open
about formerly being in a gang,

278.     Esteven Juarez threatened that the City would find a way to stop Mr. Stanley from
coming to public meetings altogether, since the trespass did not prevent Plaintiff from
attending public city meetings.  Because of the City's repeated threats, patterns of
harassment, and retaliation, Plaintiff feared Juarez and the City would follow through on
the threat, such as by putting Plaintiff in jail or worse.

---

[4] *See* 18 U.S.C. § 1725.

279.     In July 2022, Plaintiff approached City Commissioner Esteven Juarez to discuss the threats.

280.     City Commissioner Esteven Juarez responded by berating Plaintiff and calling Plaintiff a bad person for his advocacy.

281.     At one point during their heated conversation, Estevan Juarez intimidated Plaintiff by threatening, "I come from the streets, we communicate differently."

282.     Within days of this interaction, Plaintiff began receiving calls and text messages from unknown people all over Michigan finding a pair of his "keys" with Plaintiff's name and phone number on them.

283.     Plaintiff received calls and texts relentlessly for almost a month with people finding these fraudulent "keys" all around the state.

284.     On or around August 2, 2022, Plaintiff spoke with Vice Mayor, Don Cooney, about the key situation and confrontation with Commissioner Juarez.

285.     Plaintiff stated he believed that the City of Kalamazoo was intentionally retaliating against Plaintiff and trying to agitate Plaintiff.

286.     Don Cooney agreed with Plaintiff, that it was probably true that Commissioner Juarez and the City of Kalamazoo was trying to aggravate Plaintiff.

287.     About a year ago, a City employee, unprompted, came up to Plaintiff while he was eating lunch at the park, and made a veiled threat to Mr. Stanley, implying that he knew personal and private information about Mr. Stanley.

288.     Defendants City of Kalamazoo, Debra Miller, and Jason Adams used local property ordinances to target, discriminate, and retaliate against Plaintiff because of his disability; his use of a service animal; his advocacy on behalf of the disabled and the use of service

animals; for exercise of his First Amendment rights; and for his advocacy for government transparency, including right to free expression, despite not enforcing the same property ordinances against similarly situated people, including Plaintiff's neighbors.

289.     Defendants' actions have targeted Plaintiff and his service dog for unequal and retaliatory treatment under the law.

290.     Defendants' actions have caused Plaintiff to fear that he will be arrested and/or fined in a manner inconsistent with Defendants' normal practice.

291.     Defendants' actions have caused Plaintiff to miss out on the benefits and enjoyments of government and participating in his government.

292.     Defendants' actions have placed Plaintiff in great fear of retaliatory arrest for exercising the rights provided to him in the Persons with Disabilities Civil Rights Act and other Federal and State laws.

293.     Defendants' actions have caused Plaintiff significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights.

## THE KDPS PUBLIC RECORDS BUREAU'S RETALIATED AGAINST PLAINTIFF BECAUSE OF HIS DISABILITY AND FOR HIS ADVOCACY ON BEHALF OF THE DISABLED AND THOSE WITH SERVICE ANIMALS BY DENYING HIM ACCESS TO PUBLIC RECORDS AND/OR PUBLIC SERVICES

*FACTS RELATED TO COUNTS 1-6, 8, AND 10*

294.     Plaintiff incorporates the previous paragraphs as if contained herein.

295.     Defendant KDPS Public Records Bureau has consistently denied Plaintiff's FOIA Requests when information was readily available, in retaliation for Plaintiff exercising his right to access public records, his advocacy for government transparency, his attempts to

hold law enforcement accountable, and his advocacy for service dogs and persons with disabilities.

296.    KDPS Public Records Bureau refused to provide Plaintiff with record of an email sent out to city employees from the Deputy City Attorney or Deputy City Manager, which made a statement to the effect of "starting from this point forward, all dogs will not be allowed in City Hall."

297.    Plaintiff KDPS Public Records Bureau did so in retaliation against Plaintiff because of his disability, his use of a service dog, and for Plaintiff's advocacy on behalf of the disabled and those with service dogs.

298.    This policy was created in retaliation against Plaintiff after advocating for service animals and exercising his rights under the PWDCRA.

299.    In February of 2022, Plaintiff sought information regarding the time and location of upcoming public meetings.  Rather than send the information to Plaintiff electronically, as was done for others, the Bureau provided notices to Mr. Stanley by first-class mail, knowing it would not reach him in time before the scheduled public meetings.

300.    By the time Plaintiff received the mailed calendar and notice, many of the meetings were either passed, canceled, or rescheduled.

301.    Defendants' actions were in retaliation against Plaintiff because of his disability, his use of a service dog, and for Plaintiff's advocacy on behalf of the disabled and those with service dogs.

302.    These are just two examples.  Defendants regularly give Plaintiff the run-around when seeking information regarding public services from the Bureau, in retaliation against

Plaintiff because of his disability, his use of a service dog, and for Plaintiff's advocacy on behalf of the disabled and those with service dogs.

303.     Defendants' actions have caused Plaintiff to miss out on the benefits and enjoyments of government and participating in his government.

304.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

305.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

306.     Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

307.     Defendants' actions have caused Plaintiff to miss out on the benefits of government, and access to information readily available to other members of society.  They have caused Plaintiff significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights.

## HARASSMENT AT KALAMAZOO PUBLIC SCHOOLS
## BOARD OF EDUCATION MEETING
### *FACTS RELATED TO COUNTS 1-6, 8, AND 10*

308.     Plaintiff incorporates the previous paragraphs as if contained herein.

309.     On or about April 6, 2023, Plaintiff arrived at the Kalamazoo Public Schools (KPS) Board of Education meeting as both a process server to serve the Board on the *Coleman v. Kalamazoo Public Schools, et al.* case (State of Michigan 9th Judicial Circuit Court, Case

No.  2023-0137-CZ) and to attend the meeting and advocate for the rights of students with disabilities who require the use of service animals.[5]

310.　　　Upon entering the school building, security personnel employed by KPS physically blocked Plaintiff as he tried to enter the Board meeting.

311.　　　KPS Security physically shoved Plaintiff to keep him from entering the meeting.

312.　　　KPS counsel, Mr. Marshall Grate, then demanded Plaintiff disclose his disability, a prohibited question pursuant to the Persons with Disabilities Civil Rights Act, ADA, and other federal and state laws.

313.　　　After Mr. Stanley refused to inform Defendant Grate of his disability, Grate reluctantly allowed Plaintiff to attend the meeting.

314.　　　Minutes later, while Plaintiff was verbally filing a report with a KDPS officer at the building to document the incident that had just occurred, another KDPS officer claimed that City Commissioner, Jeanne Hess, also wanted Plaintiff removed.

315.　　　It was apparent by the behavior of the Head of Security and KDPS officers that they were familiar with each other on a personal level and coordinated Plaintiff's denial of entry.

316.　　　When Plaintiff attended the next Board Meeting, Security tried to block Mr. Stanley from coming inside again.

317.　　　Defendants' actions have caused Plaintiff to miss out on the benefits and enjoyments of government and participating in his government.

318.　　　The actions of Defendant KDPS, Defendant KPS' Security, and Defendant KPS' Attorney Marshall Grate demonstrate a clear lack of training in service dog laws and policy.

---

[5] https://www.mlive.com/news/kalamazoo/2023/04/kalamazoo-school-under-investigation-after-alleged-harassment-of-student-with-service-dog.html; *D.L. v Kalamazoo Public Schools*; 1:22-cv-01208, W.D. Mich (2022).

319.     Defendants actions were in retaliation against Plaintiff because of his disability; his use of a service animal; his advocacy on behalf of the disabled and the use of service animals; his exercise of his First Amendment rights; his advocacy for government transparency, including right to free expression; and his exercise of the rights provided to him in the Persons with Disabilities Civil Rights Act and other Federal and State laws, including the ADA, the Constitution, and other widely known local laws and school board policies.

320.     Defendants' actions have caused Plaintiff to miss out on the benefits of government, and access to information readily available to other members of society.  They have caused Plaintiff significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights and attending public meetings.

## CITY OF KALAMAZOO HUMAN RESOURCES RETAILATION AGAINST PLAINITFF

*FACTS RELATED TO COUNTS 1, 2, 4-6, 8, AND 10*

321.     On or about April 22, 2023, Plaintiff applied for two separate jobs with City of Kalamazoo: Pool Manager and Park Ranger.  Plaintiff applied for this job after speaking with Defendant Patrick McVerry, about how difficult it was to be a PRAB member without being able to access basic Parks and Recreation information.  Mr. McVerry agreed and encouraged Mr. Stanley to apply for a job in the Parks Department.

322.     Plaintiff was offered the Park Ranger job by the City of Kalamazoo to clean and maintain City parks and fields and enforce park policies.

323.     Defendant Artearl called Plaintiff to offer him a job and asked Mr. Stanley how soon he could start.

324.     Defendant Artearl then asked Mr. Stanley to come into Human Resources to complete his paperwork and consent to a background check and drug test, to which Mr. Stanley obliged.

325.     While trying to complete his paperwork at the Parks and Recreation office, an issue arose regarding providing Mr. Stanley an I-9 tax form, prompting Plaintiff to seek assistance from Human Resources.  A human resources employee called someone in Parks and Recreation to discuss Mr. Stanley's employment.  Mr. Stanley ultimately left after not being able to resolve the I-9 question.

326.     Plaintiff later returned to the Parks and Recreation Office to finish his paperwork. Defendant Artearl and Defendant Ashton from Parks and Recreation were in the Parks office when Plaintiff arrived to further discuss his new position, and Defendant Artearal defiantly alleged they never offered Mr. Stanley a job, nor talked to Mr. Stanley on the phone.

327.     Mr. Stanley informed Defendants Artearl and Ashton that he had a recording of the conversation.  Defendant Ashton then conceded that it did, in fact, sound like Mr. Stanley was offered a job.

328.     After this meeting, Ms. Dusek informed Mr. Stanley that the ultimate decision about the job would be up to the Parks Director.

329.     The morning of April 25, 2023, Mr. McVerry provided Mr. Stanley with a phone call stating he was "rescinding the offer of employment" because it does not appear to be "a good fit."  When Mr. Stanley inquired more into the reasoning, Mr. McVerry repeatedly stated it would simply not be a good fit.

330.     When Mr. Stanley asked if he could reapply to other positions in the Parks
Department, Mr. McVerry said "no," and promised to confirm in writing upon Mr.
Stanley's request.

331.     Mr. McVerry never provided that written confirmation.

332.     Immediately after hanging up with Mr. McVerry, Mr. Stanley called Ms. Dusek to
explain that Mr. McVerry said Mr. Stanley could not reapply for a job.  Mr. Stanley asked
her if this was true, Ms. Dusek stated that "the statement was, 'I am rescinding the offer of
employment.'"  Appearing to quote Mr. McVerry's script.

333.     Mr. Stanley then informed the Mayor of the incident.  The Mayor never responded.

334.     Ms. Dusek and Mr. McVerry, and others involved in the decision of withdrawing
Mr. Stanley's offer of employment, colluded to withdraw his offer of employment in
retaliation for Mr. Stanley's advocacy for government transparency, use of a service
animal, advocacy on behalf of the disabled, and his exercise of his First Amendment rights.

335.     Mr. Stanley has been blacklisted from any further job opportunity with the City of
Kalamazoo.

336.     Mr. Stanley has also asked the HR office to place his name on the list for bid
opportunities in the City of Kalamazoo, specifically for tree removal.  Defendants Human
Resources and City of Kalamazoo refused to include his name on the list, despite everyone
having the right to bid for city contracts.  Defendants' retaliation is clear and pervasive.

337.     Defendants' actions have caused Plaintiff to miss out on the benefits and
enjoyments of government, participating in his government, and from gainful employment.

338.     Defendants actions were in retaliation against Plaintiff for his disability; use of a
service animal; advocacy on behalf of the disabled and the use of service animals; exercise

of his First Amendment rights; advocacy for government transparency, including right to free expression; exercise of the rights provided to him in the Persons with Disabilities Civil Rights Act and other Federal and State laws; and exercise of the rights provided to him in the Persons with Disabilities Civil Rights Act, ADA, the Constitution, and other widely known Federal and State laws, local laws, and school board policies. .

339.    Defendants' actions have caused Plaintiff to miss out on the benefits of government, and access to information readily available to other members of society and prevented him from accessing information necessary for his role as a PRAB member.  They have caused Plaintiff significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights.

## DEFENDANTS CITY OF KALAMAZOO, CITY ASSESSOR, CITY ASSESSOR'S OFFICE, AND BOARD OF REVIEW FOR ASSESSMENTS UNEQUAL TREATMENT OF PLAINTIFF

*FACTS RELATED TO COUNTS 1, 2, 4-6, 8, AND 10*

340.    Plaintiff incorporates the previous paragraphs as if contained herein.

341.    Plaintiff planned to attend a July Board of Assessments meeting to present his case for a property tax exemption.

342.    The Board of Review for Assessments held a meeting July 19, 2023.

343.    There was no online public posting for the meeting, in violation of law.

344.    Because one of Defendants' methods of discrimination and retaliation was to issue Plaintiff a no-trespass order, Plaintiff was unable to enter City property to view any alleged bulletin board posting alerting the public to the date and time of the July Board of Assessors meeting.

345.     Because Plaintiff was never on notice of the official date, time, or location of the meeting, he was never aware of the July meeting date and time.

346.     Because the City, Board of Review, and City Assessor's office failed to provide online public notice of the meeting, Plaintiff was unable to attend and present his case for a property tax exemption.[6]

347.     Defendants were in retaliation against Plaintiff for his disability; his use of a service animal; his advocacy on behalf of the disabled and the use of service animals; his exercise of his First Amendment rights; his advocacy for government transparency, including right to free expression; and exercise of the rights provided to him in the Persons with Disabilities Civil Rights Act and other Federal and State laws.

348.     Defendant City, Board of Review, and City Assessor's actions prevented Plaintiff from public participation and accessing city services necessary for Plaintiff's daily life.

349.     Defendant City, Board of Review, and City Assessor's actions failure to furnish online public notice for meetings prevents individuals with disabilities full and fair access to and enjoyment of public services.

350.     Mr. Stanley was subsequently denied the property tax exemption that Mr. Stanley is qualified to receive, costing him over $1,200 in property taxes per year.

351.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

352.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

---

[6] Based upon information and belief, it does not appear an offline bulletin board posting was made, either.

353.     Defendants violated the PWDCRA by failing to make this public service accessible to the disabled public.

**DEFENDANT CITY CLERK'S OFFICE RETALIATION AGAINST PLAINTIFF**

*FACTS RELATED TO COUNTS 1-6, 8, AND 10*

354.     Plaintiff incorporates the previous paragraphs as if contained herein.

355.     On July 19, 2023, Plaintiff tried to submit nominating petitions to the Kalamazoo City Clerk's office, for his campaign for local office.

356.     When Plaintiff tried to enter the building, security officer Frank Doe stopped him at the door, and physically prevented him from entering the building, despite Plaintiff explaining he was simply dropping off his nominating petitions.

357.     Security Officer Frank Doe has obstructed Mr. Stanley's access to City functions on numerous occasions.

358.     Security officer assaulted Plaintiff in an attempt to prevent Plaintiff from enjoying the use and benefits of a public service.

359.     Plaintiff was able to circumvent Security Officer Frank Doe, but not before being assaulted.

360.     Security Officer Frank Doe provided no legitimate rationale for trying to keep Plaintiff from accessing the Clerk's office, nor for shoving Plaintiff.

361.     Instead, in further evidence of a conspiracy, Defendant Frank Doe stated "it is my job to keep you out."

362.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

363.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

364.     Defendants violated the Michigan and United States Constitutions by attempting to deny Mr. Stanley's his right to participate in the electoral process.

365.     Defendants' actions have prevented Plaintiff from exercising his right to run for public office and caused him to miss out on the benefits of government.  They have caused Plaintiff significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights.

### DEFENDANT PATRICK MCVERRY RETALIATION

### AGAINST PLAINTIFF FOR HIS ADVOCACY

*FACTS RELATED TO COUNTS 1, 2, 4-6, AND 8*

366.     Plaintiff incorporates the previous paragraphs as if contained herein.

367.     In his role as a Parks and Recreation Advisory Board member, and concerned community member, Plaintiff tried to raise awareness of an incident involving a homeless individual being arrested at the park.

368.     When Mr. Stanley tried to access the Parks and Recreation office on July 5, 2023, to fulfill his role as a PRAB member and to speak on behalf of the homeless, he encountered Mr. Patrick McVerry, who berated, threatened, screamed at, and shunned Mr. Stanley.

369.     Mr. McVerry's extreme reaction and threats prevented Plaintiff from exercising his Constitutional rights, and caused Plaintiff severe emotional distress, putting him in immediate fear for his physical safety.

370.     Through his outrageous behavior, threats, and verbal assault, Defendant violated

Mr. Stanley's Constitutional rights by preventing Mr. Stanley from participating in local

government, advocating for the homeless, and demanding governmental transparency.

## DEFENDANT KALAMAZOO PUBLIC LIBRARY, DEFENDANT KALAMAZOO PUBLIC LIBRARY INTERIM DIRECTOR,  AND DEFENDANT KALAMAZOO PUBLIC LIBRARY FORMER DIRECTOR RETALIATION AGAINST PLAINTIFF

*FACTS RELATED TO COUNTS 1, 2, 4, 5, 6, 8, AND 10*

371.     Plaintiff incorporates the previous paragraphs as if contained herein.

372.     Plaintiff is a frequent patron of the public library, often there to read and avail

himself of public services.

373.     Plaintiff asked multiple employees of the library about service dog policies,

because they were giving him a hard time about having his service dog in the building.

374.     Library employees repeatedly tried to evade Plaintiff's questions, gave him vague

answers, and asked him to start making complaints and comments in writing.

375.     Over time, there was a general uneasiness between Plaintiff and the library

employees regarding him bringing his dog.

376.     In or around June 2022, the Michigan House and Senate approved a new service

dog "in training" law.

377.     Plaintiff believed this law to be in effect, and he asked that the library to update

their service dog policies to be incompliance with the new law.

378.     Plaintiff was told again to make his request in writing, which Mr. Stanley did.

379.     Plaintiff believed his request would be confidential and shared only with management, as it contained personal and identifiable information regarding himself and his disability.

380.     The library employee then proceeded to make numerous copies of Plaintiff's requests, at least 40 copies.

381.     When Plaintiff asked for his request back because he did not want his personal information shared, Library employees ignored Plaintiff.

382.     Plaintiff made his way towards the Administrator's Office to address the pending release of information regarding his disability, when the Library Director came out yelling, "call the police!"  Defendants would later falsely state Mr. Stanley was allegedly yelling in violation of library policy, when in fact, the Director was the only one yelling.

383.     The Library Director's actions prevented Plaintiff from asserting his rights related to his disability and to advocate on behalf of others with disabilities, and Defendants' decision to trespass Plaintiff from the library because of his advocacy on behalf of the disabled resulted in Plaintiff being denied access to the public services provided by the library.

384.     Defendants actions were in retaliation against Plaintiff because of his disability; his use of a service animal; his advocacy on behalf of the disabled and the use of service animals; his exercise of his First Amendment rights; his advocacy for government transparency, including right to free expression; and exercise of the rights provided to him in the Persons with Disabilities Civil Rights Act and other Federal and State laws.

385.     Defendant's actions caused Plaintiff to miss out on the benefits of government and obstructed his use of public services at the Library.  Defendants have caused Plaintiff

significant fear, mental and physical harm, and have prevented him from exercising his Constitutional rights.

386.   Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

387.   Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

388.   Defendants violated Plaintiff's First Amendment rights to advocate for the use of service animals, advocate for the disabled, and to address his local government, in this case, the Library Director.

<u>COUNT 1: Violation of the First Amendment</u>

389.   Plaintiff incorporates the previous paragraphs as if contained herein.

390.   Under 42 U.S.C. § 1983, a person acting on behalf of the State who causes a citizen of the United States to be deprived of any rights, privileges, or immunities secured by the Constitution shall be liable to that party at law.

391.   The First Amendment guarantees citizens the right to freedom of speech and participation in their government.  U.S. Const. amend. I.

392.   All of the actions taken by all Defendants, or those acting on behalf of, or conspiring with, Defendants, and referred to herein, were done by all Defendants while acting under color of state law.

393.   Defendants' wrongful acts were carried out in retaliation for, or to prevent, Plaintiff exercising his right to free speech guaranteed by the Free Speech Clause of the First

Amendment to the United States Constitution and to prevent Plaintiff from petitioning his government for a redress of grievances.

394.     Defendants' wrongful acts include, but are certainly not limited to, retaliation against Mr. Stanley for making audio and visual recordings of public incidents, making verbal and written complaints against City Defendants, desiring to speak at public meetings, and generally advocating on behalf of the disabled and those with service dogs.

395.     Defendants' acts were intentional, malicious, willful, wanton, and in reckless disregard of Plaintiff's constitutional rights.

COUNT 2: Violation of the Fourteenth Amendment Equal Protection Clause

396.     Plaintiff incorporates the previous paragraphs as if contained herein.

397.     Under 42 U.S.C. § 1983, a person acting on behalf of the State who causes a citizen of the United States to be deprived of any rights, privileges, or immunities secured by the Constitution shall be liable to that party at law.

398.     The Fourteenth Amendment guarantees citizens the right to equal protection under the law.  U.S. Const. amend.  XIV.

399.     The Fourteenth Amendment also guarantees citizens the right to equal protection under the law, regardless of their protected or unprotected status.

400.     All of the actions taken by Defendants, or those acting on behalf of, or conspiring with, Defendants, and referred to herein, were done by Defendants while acting under color of state law.

401.     Defendants' wrongful acts were carried out by Defendants, either in retaliation for Plaintiff demanding equal protection of the laws under the Fourteenth Amendment to the

United States Constitution, or for the purpose of treating Plaintiff differently than similarly situated individuals.

402.    Specifically, Defendants acts deprived Plaintiff of his right to Due Process and Equal Protection of the Laws under the Fourteenth Amendment.

403.    Defendants' acts were intentional, malicious, willful, wanton, and in reckless disregard of Plaintiff's constitutional rights.

<u>COUNT 3: Violation of the Fourth Amendment Protection Against</u>

<u>Unreasonable Seizure by the Government</u>

404.    Plaintiff incorporates the pervious paragraphs as if contained herein.

405.    Under 42 U.S.C. § 1983, a person acting on behalf of the State who causes a citizen of the United States to be deprived of any rights, privileges, or immunities secured by the Constitution, shall be liable to that party at law.

406.    The Fourth Amendment to the Constitution provides that citizens should be free from unreasonable searches and seizures.

407.    A seizure occurs under the Fourth Amendment when physical force is applied to the body of a person with intent to restrain him.

408.    Plaintiff was seized within the meaning of the Fourth Amendment when Defendants ISK, City of Kalamazoo, David Anderson, Bronson Security, Bronson Physician(s), Unknown Bronson Hospital Staff, KDPS, KDPS Officers, and Sgt. Khillah, orchestrated and/or fraudulently obtained a judicial order to commit Mr. Stanley to a mental health facility, and physically prevented Plaintiff from leaving Bronson despite requesting a discharge.

409.     Plaintiff was further seized within the meaning of the Fourth Amendment when Defendants Frank Doe and KPS Security Chief shoved and grabbed Plaintiff to restrain him from entering public buildings.

410.     Defendants violated Plaintiff's right to be safe against unreasonable seizures and from excessive force.

411.     Plaintiff suffered severe emotional distress and both mental and physical damages from these incidents.

<u>COUNT 4: Conspiracy to Deprive a Person of Rights or Privileges</u>

412.     Plaintiff incorporates the previous paragraphs as if contained herein.

413.     Under 42 U.S.C.  § 1985(3),  "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

414.     All of the actions taken by all Defendants, or those acting on behalf of, or conspiring with, Defendants, and referred to herein, were done by Defendants while acting under color of state law.

415.     Defendants' wrongful acts were carried out in concert in order to deprive Plaintiff of his Constitutional rights.

416.     Defendants' acts were conspiratorial, intentional, malicious, willful, wanton, and in reckless disregard of Plaintiff's Constitutional rights.

<u>COUNT 5: Retaliation and Discrimination under the PWDCRA</u>

417.     Plaintiff incorporates the previous paragraphs as if contained herein.

418.     Under MCL 37.1302 an individual with a disability shall not be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

419.     Under MCL 37.1602, it is unlawful for one or more persons to retaliate or discriminate against an individual who has opposed a violation of the PWDCRA; to aid, abet, incite, compel or coerce a person to engage in a violation of the PWDCRA; or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of any right granted or protected under Article 5 of the Act.

420.     By taking the actions detailed in this Complaint, Defendants violated the PWDCRA.

421.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

422.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

423.     Defendants violated Mr. Stanley's First Amendment right to advocate for the use of service animals, advocate for the disabled, and advocate for governmental transparency.

<u>COUNT 6: Violation of Due Process under the Fourteenth Amendment of the U.S. Constitution</u>

<u>and Michigan Constitution</u>

424.     Plaintiff incorporates the previous paragraphs as if contained herein.

425.     Under 42 U.S.C. § 1983, a person acting on behalf of the State who causes a citizen of the United States to be deprived of any rights, privileges, or immunities secured by the Constitution shall be liable to that party at law.

426.     The Fourteenth Amendment prohibits the State from depriving any person of life, liberty, or property without due process of law.  U.S. Const. amend. XIV.

427.     Additionally, Article I § 17 of the Michigan Constitution states, "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." Const 1963, art I, § 17.

428.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

429.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

430.     Defendants violated Plaintiff's First Amendment rights to advocate for the use of service animals, advocate for the disabled, and to address his local government.

431.     By taking the actions detailed in this Complaint, Defendants violated the Mr. Stanley's Due Process rights.

## COUNT 7: False Imprisonment

432.     Plaintiff incorporates the previous paragraphs as if contained herein.

433.     The elements of false imprisonment are "[1] an act committed with the intention of confining another, [2] the act directly or indirectly results in such confinement, and [3] the person confined is conscious of his confinement." *Adams v. Nat'l Bank of Detroit*, 444 Mich. 329, 341, 508 N.W.2d 464, 468 (1993).

434.     "False imprisonment also requires that '[t]he restraint ... occurred without probable cause to support it.'" *Bletz v. Gribble*, 641 F.3d 743, 758 (6th Cir. 2011) (quoting *Walsh v. Taylor*, 263 Mich.App. 618, 689 N.W.2d 506, 513 (2004)).

435.     Plaintiff was confined to Bronson by hospital staff who stole Plaintiff's clothing to prevent him from leaving, prevented him from being discharged, and physically stopped Plaintiff from leaving the hospital.

436.     Defendants fraudulently initiated a commitment petition against Mr. Stanley with the intention of confining him against his will.

437.     Plaintiff was aware of his confinement at Bronson as he knew he did not have the ability to leave.

438.     By taking the actions detailed in this Complaint, Defendants violated the Mr. Stanley's Due Process rights.

## COUNT 8: Intentional Infliction of Emotional Distress

439.     Plaintiff incorporates the previous paragraphs as if contained herein.

440.     All Defendants, or those acting on behalf of, or conspiring with, Defendants, and referred to herein, engaged in retaliatory, discriminatory, and intimidating conduct towards Plaintiff that caused Plaintiff physical and emotional harm.

441.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

442.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

443.     Defendants violated Plaintiff's First Amendment rights to advocate for the use of service animals, advocate for the disabled, and to address his local government.

444.     Defendants' conduct was intentional.

445.     Defendants' conduct was extreme and outrageous.

446.     The conduct was the cause of Plaintiff's complaint; and

447.     Defendants' conduct caused Plaintiff severe emotional distress.

448.     By taking the actions detailed in this Complaint, Defendants violated the Mr. Stanley's Due Process rights.

<u>COUNT 9: Malicious Prosecution</u>

449.     Plaintiff incorporates the previous paragraphs as if contained herein.

450.     Malicious prosecution requires that a Plaintiff prove (1) prior proceedings terminated in favor of Plaintiff; (2) absence of probable cause for the proceedings; (3) malice, defined as a purpose other than that of securing the proper adjudication of the claim; (4) a special injury that flows directly from the prior proceedings. *Early Detection Ctr., Prof'l Corp. v. N.Y. Life Ins. Co.*, 157 Mich. App. 618, 627, 403 N.W.2d 830, 834 (1986).

451.     Special injury requires showing "injury to one's fame (as by a scandalous allegation), injury to one's person or liberty, and injury to one's property." *Id.* citing *Friedman v Dozorc*, 412 Mich 1, 33; 312 NW2d 585 (1981).

452.     The proceedings against Plaintiff by Defendants City of Kalamazoo, City Manager, City of Kalamazoo Attorney's Office, and Charles Bear for a criminal trespass terminated in Plaintiff's favor when the charges were dismissed within few weeks after being initiated.

453.     Defendants lacked probable cause because the trespass was based on an incident where Plaintiff was instructed to go to City property to turn in signatures to run for office.

454.     Defendants pursued this prosecution for a purpose other than that of securing proper adjudication of the claim, namely, to further discriminate against Mr. Stanley, harass him, improperly prevent him from accessing city property and service, and retaliating against Mr. Stanley for his advocacy and running for public office.

455.     Plaintiff suffered a special injury through violation of his civil rights and due process, as the criminal charges were for the improper purpose of discriminating against, retaliating against, and harassing Mr. Stanley.

456.     Defendants discriminated against Mr. Stanley because of his disability and his use of a service dog.

457.     Defendants retaliated against Mr. Stanley due to his assertion of his rights under the PWDCRA and his advocacy on behalf of the disabled and those who use service animals.

458.     Defendants violated Plaintiff's First Amendment rights to advocate for the use of service animals, advocate for the disabled, and to address his local government.

<u>COUNT 10: Violation of MCL 750.502c</u>

459.     Plaintiff incorporates the previous paragraphs as if contained herein.

460.     MCL 750.502c makes it a crime for a place of public accommodation to ask about a person with a disability's disability, require medical documentation, request medical records, require a special identification card or training documentation for the service animal, or ask that the service animal demonstrate its ability to perform work or a task.

461.     MCL 750.502c requires a place of public accommodation to modify its policies, practices, and procedures to permit the use of a service animal by a person with a disability. MCL 750.502c(1).  The statute also requires a place of public accommodation to modify its policies, practices, and procedures to permit the use of a service animal in training.

462.     A public accommodation shall permit a person with a disability to be accompanied by his or her service animal and shall permit an animal raiser or trainer to be accompanied by his or her service animal in training in all areas of a place of public accommodation where members of the public, program participants, clients, customers, patrons, or invitees are permitted to go, including public areas of establishments that sell or prepare food, even if state or local health codes prohibit animals on the premises.  MCL 750.502c(10).

463.     A public accommodation shall not treat a person with a disability accompanied by his or her service animal less favorably than other patrons.  MCL 750.502c(11)(c).

464.     Defendants violated this act by asking Plaintiff improper questions regarding his disability, service animal, and service animal in training on multiple occasions.

465.     Defendants violated this act by not making meaningful modifications to policies, practices, and procedures to permit the use of a service animal or service animal in training, thereby impeding Plaintiff's ability to access public events and opportunities.

466.    Defendants violated this act by requiring Plaintiff to maintain service dog identification, such as a vest, ID card, and/or training documentation, as a condition of access to a place of public accommodation.

467.    Defendants violated this act by treating Plaintiff less favorably than other patrons because of his use of a service dog.

WHEREFORE, Plaintiff, Benjamin Stanley, prays that this Honorable Court order the following:

1.  Grant Mr. Stanley injunctive relief and compel Defendants to rescind their active trespass against Plaintiff.

2.  Grant Mr. Stanley injunctive relief and compel Defendants to train their employees and agents in state and federal disability law;

3.  Award Mr. Stanley actual and compensatory damages no less than $5,000,000.00;

4.  Award Mr. Stanley punitive damages;

5.  Award Mr. Stanley statutory damages;

6.  Award Plaintiff his attorney fees and costs pursuant to 42 USC §§ 1983, 1985, and PWDCRA.

7.  Find that Defendants violated Plaintiff's First Amendment Rights.

8.  Find that Defendants violated Fourteenth Amendment Equal Protection rights.

9.  Find that Defendants violated Plaintiff's Fourth Amendment rights.

10. Find that Defendants violated Plaintiff's Fourteenth Amendment Due Process Rights.

11. Find that Defendants violated the PWDCRA.

12. Find that Defendants falsely imprisoned Plaintiff.

13. Find that Defendants actions were intentional inflictions of emotional distress.

14. Find that Defendants maliciously prosecuted Plaintiff.

15. Find that Defendants violated MCL 750.502c.

16. Enjoin Defendants from further violations of Plaintiff's rights.

17. Compensate Plaintiff for all damages incurred.

18. Apply and award to Plaintiff all appropriate fines and penalties against Defendants available under the ADA, PWDCRA, and other violations of law alleged herein.

19. Provide any other relief the Court deems fit.


Dated: February 13, 2024                     DELAPORTE LYNCH, PLLC


                                             Eric D. Delaporte (P69673)
                                             210 State St., Suite B
                                             Mason, MI 48854
                                             (517) 999-2626
                                             Eric@DelaporteLynch.com

## **JURY DEMAND**

Pursuant to FRCP 38, Plaintiff Benjamin Stanley requests that these counts incorporated herein be tried by a jury.

Dated: February 13, 2024                    DELAPORTE LYNCH, PLLC

Eric D. Delaporte (P69673)
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com